**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**LINDA AGUILAR,**

                                **Plaintiff,**

**-vs-**                                                        **Case No.  6:05-cv-281-Orl-KRS**

**COMMISSIONER OF SOCIAL**
**SECURITY,**

_____

**ORDER**

        This cause came on for consideration on the Complaint filed by Linda Aguilar

seeking review of the final decision of the Commissioner of Social Security denying her

claim for social security benefits.  Doc. No. 1.  The Commissioner answered the

Complaint and filed a certified copy of the transcript of the proceedings before the Social

Security Administration ("SSA").  Doc. No. 12.  Pursuant to the consent of the parties,

this case has been assigned to me for disposition.  Doc. Nos. 13, 14.

**I.      PROCEDURAL HISTORY.**

        In July 1998, Aguilar filed a claim for disability benefits under the Supplemental

Security for the Aged, Blind and Disabled Program ("SSI"), 42 U.S.C. § 1381, *et seq*.,

(the "Act"), alleging an onset date of December 1, 1996.  R. 186. This claim was denied

initially and on reconsideration.  R. 35-38.

Aguilar requested review by an administrative law judge ("ALJ"), who held a hearing on August 12, 1999.  Aguilar, who was represented by counsel, testified.  No other testimony was taken.  R. 276-304.

On September 29, 1999, the ALJ issued a decision denying Aguilar's claim.  R. 162-70. Aguilar requested review of this decision by the Appeals Council.  R. 39-43.  The Appeals Council granted the request for review, vacated the decision of the ALJ, and remanded the case for further consideration.  R. 45-46.  It directed that, upon remand, the ALJ should do the following: (1) "[i]f he concludes that the claimant's impairment(s) do not meet or equal a Listed impairment, he shall give specific reasons for such findings, citing the specific Listing or Listings considered, the requirements of those Listings and why the claimant failed to meet or equal those requirements"; (2) reconsider Aguilar's residual functional capacity ("RFC") supported by specific references to the evidence in the record supporting the conclusion; (3) if the ALJ's relies upon the RFC assessments of reviewing physicians, state why evidence received subsequent to those assessments did not alter their findings or conclusions; and (4) obtain evidence from a vocational expert ("VE") at step five of the sequential evaluation process.  R. 46.

Pursuant to the Appeals Council's order, the ALJ held a supplemental hearing on July 10, 2002.  Aguilar, again represented by an attorney, testified.  Natalie Tessari, a VE, also testified.  R. 307-52.

On December 18, 2002, the ALJ issued a decision.  R. 14-26.  The ALJ concluded that Aguilar had not engaged in substantial gainful activity since December 1, 1996, the alleged onset date of her disability.  R. 14.

-2-

The ALJ found that Aguilar had the following impairments: bilateral chronic knee pain due to internal derangement of both knees with underlying osteoarthritis with the need for bilateral total knee arthroplasties; bilateral arm pain and numbness due to carpal tunnel syndrome; migraine headaches; allergic rhinitis; and.\, history of osteochondritis dissecans[1] of both knees after bilateral knee surgery in 1974 and in 1989, as well as remote elbow surgery and remote left wrist fracture.  R.  18.  The ALJ concluded that these impairments were severe.  *Id.*

With respect to whether Aguilar's condition met or equaled any impairment listed in the SSA regulations, the ALJ wrote as follows:

> However, physical examinations failed to show the claimant with clinical and laboratory findings necessary to meet the criteria of any listed musculoskeletal impairments in the Listings of Impairments.  Thus, the undersigned Administrative Law Judge is persuaded the claimant does not have an impairment or combination of impairments that meets or equals the criteria of any listed impairment.

R. 18.

The ALJ concluded that beginning December 1, 1996, through September 30, 2001, Aguilar had the RFC to do the following:

> [L]ift and carry 10 pounds at a time and less than 10 pounds frequently; sit for up to six hours with stand and/or walk for a total of at least two hours in an eight-hour workday and stoop occasionally[;] and, she was limited to performing hand-finger actions occasionally.

---

[1]    A condition where pieces of bone and cartilage detach from the underlying bone, which can make the joint unstable.  This causes pain and feelings that the joint is catching or giving way.  *See* Familydoctor.org *Osteochondritis Dissecans*, *at* http://familydoctor.org/488.xml (last visited March 14, 2006).

In reaching this conclusion, the ALJ gave no significant weight to a functional capacity assessment prepared by Dr. Psarakis, one of Aguilar's treating physicians.  The ALJ concluded that Dr. Psarakis' opinion was not supported by relevant medical evidence and was inconsistent with the record as a whole.  R. 21.

The ALJ concluded that Aguilar would not have been able to perform any of her past relevant work with this RFC.  Using the Medical-Vocational Guidelines (the "grids"), 20 C.F.R. Pt. 404, Subpt. P. App. 2, as a framework indicated that Aguilar was not disabled from December 1, 1996, through September 30, 2001. R. 22. The ALJ also relied upon the testimony of the VE that there was work available that someone with Aguilar's RFC could perform. R. 23.  Thus, the ALJ concluded that during this time Aguilar could have performed the jobs of small products assembly or dispatcher, both of which were available in significant numbers in the national economy.  *Id*.  Accordingly, the ALJ concluded that Aguilar was not disabled between December 1, 1996, and September 30, 2001.  *Id*.

The ALJ further concluded that the record demonstrated that Aguilar's condition worsened beginning about October 2001, due to advanced osteoarthritis and internal derangement of both knees with clinical evidence of crepitus and instability of the knees. R. 23. Accordingly, the ALJ concluded that Aguilar was disabled beginning October 1, 2001. R. 24.

-4-

Aguilar requested review of the decision by the Appeals Council. R. 8.  The Appeals Council denied the request for review on September 10, 2004.  R. 4.  Thereafter, Aguilar sought review of the Commissioner's decision partially denying her SSI claim.  Doc. No. 1.[2]

## II.  JURISDICTION.

The Commissioner of the SSA issued a final decision after a hearing with respect to Aguilar's application for benefits under SSI.   As such, the Court has jurisdiction over this matter under 42 U.S.C. § 405(g), as adopted by reference in 42 U.S.C. § 1383(c)(3).

## III.  STATEMENT OF FACTS.

A.     *Aguilar's Testimony*.

Aguilar was born July 14, 1959.  She completed high school and one year of college. R. 279, 308.

Aguilar had not worked since moving to Florida in 1996.  R. 284.  Her last employment was at an assembly line for a staffing agency in Seattle. R 281-82.  Prior to that, she had worked in various warehouse positions, and as a fiberglass laminator.  R. 282. She had also worked as a cashier and as a hostess for a restaurant.  R. 283-84.

At the 1999 hearing before the ALJ, Aguilar testified as follows:

Aguilar injured her knees and legs when she was ten or eleven years old.  R. 288. Since then, she had daily knee pain, which she rated as eight in severity on a ten-point scale.  R. 289.  She could not lift more than five to ten pounds and had problems bending

---

[2]        The complaint is this case was not filed until February 23, 2005, which appears to be well after the sixty days (plus mailing time) within which the complaint was due to be filed. However, Aguilar alleged that the complaint was timely filed, doc. no. 1  ¶ 7, and the Commissioner admitted this allegation, doc. no. 12 ¶ 1.  Based on the Commissioner's admission, I will treat this complaint as timely filed.

due to the difficulty with her knees.  R. 285.  Walking and grocery shopping exacerbated the pain in her knees.  R. 290.  She used a cane, but she acknowledged that no doctor had instructed her to use it.  R. 290.

Aguilar was in a car accident in April 1993, in which she injured her ankle.  She had pain in her ankle that would shoot up through her leg.  R. 287.  She estimated that each episode of pain lasted five to ten minutes, and recurred throughout the day.  R. 287.  The pain was worsened by walking and standing.  R. 287.  Aguilar would elevate her feet three to four times a day to alleviate the pain.  R. 288.

She also had problems lifting and holding items with her hands due to carpal tunnel syndrome.  R. 285.  Her hands also went numb while driving.  R. 293. Surgery had been recommended for her carpal tunnel syndrome, but was cancelled because her blood pressure was too high.  R. 286.

Aguilar had hypertension going back to at least 1995, for which she was taking medication.  R. 290-92.  She had recently had elevated blood pressure, with episodes of lightheadedness lasting fifteen to thirty minutes at a time.  R. 303.

Aguilar had neck pain about three times each week that caused her to have trouble turning her head while driving .  R. 292. She rated her neck pain as five in severity on a ten-point scale.  R. 293.  She also had approximately three migraines a month.  R. 295. The headaches lasted a minimum of two days up to a week at a time.  R. 296.  If medication did not alleviate the headaches, she would lie down in a dark room with a cold cloth over her eyes.  The headaches sometimes caused her to be dizzy and lightheaded.  R. 296.

Aguilar also injured her back at work.  As a result, she took muscle relaxers.  R. 297.

Aguilar estimated that she could sit for about thirty minutes at a time.  R. 296.  She could stand from five to fifteen minutes, but then would need to sit due to pain in her knees.  R. 297.  She could walk between fifteen and thirty minutes.  R. 298.  She would need to rest for fifteen to thirty minutes after walking or standing.  R. 298.  Sitting for extended period also caused pain in her knees.  R. 298.

During a typical day, Aguilar awoke at about 6:15 a.m.  She made sure that her children left for school.  During the day, Aguilar would read books or watch television.  She could fold clothes.  Her husband helped her fix dinner.  R. 300. She could do fifteen or twenty minutes of grocery shopping early in the day.  R. 301.  Her knees were sore, and she had difficulty pushing herself up with her hands.  R. 299.  Aguilar had difficulty sleeping due to pain.  R. 299.

At the supplemental hearing in 2001, Aguilar provided the following testimony regarding her condition:

 Aguilar's ability to walk had deteriorated since 1998.  She had no cartilage left in her knees.  R. 318.

In September 2000, Aguilar had been hospitalized because her leg locked.  At the hospital it was determined that her blood pressure was too high.  R. 323.  She continued to have migraine headaches about twice a month.  R. 325.

She could not stand for long because her knees buckled.  She elevated her legs all day.  She could not bend or kneel.  R. 326.  She also had trouble sitting because her legs

would cramp and she would have pain in her knees.  R. 326-27.  She sometimes used a scooter to go shopping.  R. 328.

She was still dropping things due to carpal tunnel syndrome.  R. 327.  She had pain in her hands, and she did not have full range of motion in her fingers.  R. 327.  She estimated that she could lift no more than a glass of water.  R. 328.

> B.    *Medical Evidence.*[3]

Medical records from as early as 1973 indicate that Aguilar had chronic knee pain and osteochondritis dissecans from childhood.  R. 214-25.  She had arthroscopic surgery on her right knee in 1974, and an arthrotomy on her left knee in 1976.  R. 220, 223-24.  She had an arthrotomy on both knees in 1977.  R. 219.  Despite the surgeries, treatment notes reflect that she had mild internal derangement of her left knee.  R. 216.  In 1986, Aguilar strained her low back doing lifting, resulting in back pain.  R. 204-05.[4]  In 1989, an x-ray revealed subluxation of both patellae.[5] R. 213.  Another surgery was performed on her right knee.  The treatment notes reflect that due to bilateral osteochondritis dissecans, Aguilar would be limited to a sedentary job.  *Id.*

After an automobile accident on December 24, 1996, Aguilar had a course of physical therapy at Healthsouth beginning in October 1997.  At the initial evaluation, Aguilar

---

[3]    Because Aguilar does not dispute the finding of disability after October 1, 2001, I will not summarize records after 2001 unless otherwise relevant.

[4]    The ALJ noted a report from September 1986 indicating that Aguilar wished to be disabled from work.  R. 205.  Because this does not go to the question of whether Aguilar was in fact disabled, I note it only in passing.

[5]    A partial dislocation of the kneecap.  *See* STEDMAN'S MEDICAL DICTIONARY 1693 (26th ed. 1995).

complained of shooting pain in her left forearm into her wrist and thumb.  She had the same symptoms, to a lesser degree, on the right.  She reported that she dropped things easily, more often with the left hand than the right.  She also had problems with headaches and neck pain.  Shannon Merrick, physical therapist, noted upon examination that Aguilar had mild tenderness in the area of her cervical spine, and pain at the end of wrist and elbow range-of-motion tests.  She had a positive Tinel's sign on the left.[6]  R. 105.

In March 1998, Aguilar sought treatment from Mark Psarakis, M.D.  She complained of chronic migraine headaches and allergic rhinitis, as well as a history of problems with her knees and elbow.  Dr. Psarakis prescribed medication.  R. 239.

In March 1998, Hector Ramirez, M.D., examined Aguilar.  She complained of knee pain, numbness and tingling in her finger joints and discomfort in her right shoulder.  She also had frequent headaches and nasal congestion with allergic rhinitis.   She reported that she exercised by riding a bicycle and walking.  Upon examination, Dr. Ramirez noted some crepitus in both knees, but no instability.  Tinel's signs were negative.  There was some mild periarthritis in her right shoulder.  His assessment was that Aguilar had mild periarthritis of her right shoulder, probable mild bilateral carpal tunnel syndrome and osteochondritis dissecans with secondary osteoarthritis of both knees.  R. 235-36.

---

[6]     The Tinel's sign test is "an examination test that is used by doctors to detect an irritated nerve. Tinel's sign is performed by lightly banging (percussing) over the nerve to elicit a sensation of tingling or 'pins and needles' in the distribution of the nerve.  For example, in a person with carpal tunnel syndrome where the median nerve is compressed at the wrist, Tinel's sign is often 'positive' and causes tingling in the thumb, index, and middle fingers."  MedicineNet, Inc., *Definition of Tinel's Sign, at* http://www.medterms.com/script/main/art.asp?articlekey=16687 (last visited March 14, 2006).

In May 1998, Dr. Ramirez prescribed wrist braces.  He noted that Aguilar had minimal discomfort with range of motion of her shoulder.  R. 237.  Later in the month, Dr. Ramirez wrote that nerve conduction studies confirmed that Aguilar had bilateral carpal tunnel syndrome.  R. 238.

In May 1998, electrodiagnostic testing by Thomas G. Hoffman, M.D., resulted in a diagnosis of "[v]ery mild left carpal tunnel syndrome."  R. 109.

In July 1998, Kimberly Marriot, a physical therapist, examined Aguilar.  Aguilar reported that her pain was intermittent and worsened with bending her head forward, prolonged sitting, and when rising from a lying position.  Pain also disturbed her sleep. Nevertheless, Aguilar enjoyed bike riding, swimming, and walking. R. 270.  Marriot observed upon examination that Aguilar had minimal restriction of range of motion in her neck, with tenderness at trigger points in the trapezius and rhomboid muscles.  R. 270-71.[7]

In November 1998, Dr. Ramirez noted that an x-ray of Aguilar's right knee showed changes consistent with moderate to severe degenerative arthritis.  R. 110.  This diagnosis was largely confirmed by Robert Cooper, M.D., who prescribed the use of a brace.  R. 112-13.

In September 1998, Dr. Psarakis examined Aguilar for continuing complaints of chronic shoulder and neck pain, among other problems.  Dr. Psarakis referred Aguilar to a chiropractor. R. 97-98. Michael Kambourelis, D.C., treated Aguilar with spinal manipulation. R. 226, 261-69 .

---

[7]     Also in July 1998, Aguilar was interviewed by a representative of the SSA.  The report of the interview contains a note that Aguilar "limped after sitting for [the] interview."  R. 57.

In March 1999, Dr. Psarakis referred Aguilar for an x-ray of her knees, which showed no acute fractures or dislocations, but did show moderate degenerative arthropathy and narrowing of the medial joint in both legs.  R. 111.  Dr. Psarakis also referred Aguilar to Dr. Cooper for evaluation.  R. 112-13.  Dr. Cooper observed a varus thrust[8] with weightbearing, no ligamentous laxity, and full range of motion.  Dr. Cooper's assessment was that Aguilar had marked arthritis that would be treated with medication and a knee brace.  He recommended that Aguilar delay knee arthroplasty for as long as possible.  R. 112.

In April 1999, Aguilar again presented to Dr. Psarakis.  She reported that medication had been effective in treating her migraine headaches.  R. 98.

In May 1999, Carlos K. Woodward, M.D., examined Aguilar for complaints of pain and numbness in both hands for the previous one and one-half years.  Dr. Woodward opined that tests were positive for mild to moderate carpal tunnel syndrome.  He prescribed medication and use of wrist splints.  R. 114.  In July, Aguilar reported that her condition had not improved.  R. 115.

In June 1999, Aguilar visited Dr. Psarakis to ask about a recommendation that she have knee surgery.  She reported that she could not stand, bend, or walk for long distances. She also had poor use of her hands and extremities.  R. 92.  Dr. Psarakis opined that Aguilar's migraines and osteoarthritis were stable.  He directed her to follow-up on the diagnosis of osteochondritis dissecans in four to six months.  R. 100.

---

[8]      A condition where the knee curves inward toward the midline of the body.  *See* MEDICAL DICTIONARY, *supra*, at 1908.

On June 4, 1999, Dr. Psarakis completed a physical capacity evaluation.  He opined that Aguilar could sit for one hour in an eight-hour workday, stand for thirty minutes, and walk for five minutes.  Dr. Psarakis concluded that Aguilar could not work an eight-hour workday, and that no accommodations could be made that would permit her to do so.  R. 101.  Dr. Psarakis also concluded Aguilar could never lift even ten pounds, and that she could not grasp, push or pull, or engage in fine finger action.  She could also never bend, squat, crawl, climb, or reach.  She should not work around hazards, chemicals, dust, fumes, humidity, noise, and vibration.  R. 102.  Dr. Psarakis based these restrictions on Aguilar's bilateral carpal tunnel syndrome, bilateral osteoarthritis of her knees and bilateral torn ligaments in her ankles.  R. 103.  Dr. Psarakis opined that January 1974 was the earliest date to which these restrictions applied.  R. 103.

On July 27, 1999, Aguilar presented to Dr. Psarakis with complaints of left shoulder and arm pain radiating from her neck to her left elbow with some numbness in her arm occasionally.  She also had chronic bilateral foot pain in her heels.  Upon examination, Dr. Psarakis found full range of motion in upper and lower extremities.  He opined that the shoulder and foot pain were likely musculoskeletal in origin.  R. 117-18.

In August 1999, Aguilar presented with symptoms associated with hypertension.  R. 122.

Dr. Psarakis examined Aguilar again in April 2001.  The treatment notes reflect that the gap in treatment was due to insurance issues.  She had high blood pressure, which Dr. Psarakis treated with medication.  Aguilar had no other complaints.  R. 121.

On September 17, 2001, Aguilar presented at an emergency room after her left knee locked.  R. 124.  She was noted to be in mild distress and to have a limited range of motion. R. 124.  Her gait was limited by pain.  R. 124.  Aguilar reported feeling better after receiving medication, and she ambulated well with crutches when she was discharged.  R. 128.

On September 24, 2001, Aguilar presented to Dr. Ramirez.  He noted the September 17 emergency room visit but observed, "[t]his has improved[;] [s]he is not taking any medications at this time."  R. 133.  Dr. Ramirez noted osteoarthritis in both knees, crepitus, and instability.  R. 133.  Dr. Ramirez prescribed medication and quadriceps strengthening exercises.  R. 133.

On October 16, 2001, Dr. Ramirez observed that Aguilar continued to experience a significant amount of pain in her knees, with occasional locking.  He also observed discomfort in her shoulders and left wrist. R. 140.

In June 2002, Dr. Psarakis prepared another physical capacities evaluation form.  He opined that Aguilar could sit one hour, stand ten minutes, but could not walk.  She could sit up to one hour in a eight-hour workday.  She could never lift up to five pounds.  She also could never grasp, push or pull, or perform fine finger manipulation.  She could never engage in postural activities, and she needed to avoid exposure to hazards, noise, vibration, humidity, chemicals, dusts, fumes and temperature extremes.  R. 156-57.  Dr. Psarakis based these limitations on osteoarthritis dissecans, severe arthritis, lumbar disc disease, and migraine headaches. R. 158.

*C.      Reviewing Physicians.*

In August 1998, Jane S. Johnson, M.D., a gastroenterologist, completed an RFC assessment based on a review of Aguilar's records.  She opined that Aguilar could lift up to fifty pounds occasionally and twenty-five pounds frequently.  She could sit, stand or walk six hours during an eight-hour workday.  She could only occasionally climb ladders, ropes and scaffolds.  She would also need to avoid concentrated exposure to hazards. R. 243-50.

In November 1998, J.J. Green, M.D., completed an RFC assessment based on a review of Aguilar's records.  Dr. Green opined that Aguilar could occasionally lift up to twenty pounds, frequently lift up to ten pounds, stand or walk for at least two hours in an eight hour workday, and sit for about six hours in an eight-hour workday. R. 253.   He concluded that Aguilar should only occasionally perform postural activities.  She should avoid concentrated exposure to heights. R. 252-60.

*D.      Vocational Expert Testimony*

The ALJ posed the following hypothetical to the VE: assume a younger individual, with a high school education and work experience as described; occasionally lift up to twenty pounds and frequently ten pounds; stand and or walk two hours in an eight-hour workday, sit about six hours in an eight-hour workday; unlimited ability to push and pull; only occasional climbing, balancing, stooping, kneeling, crouching, crawling; needs to avoid hazards such as heights.  The VE opined that such a claimant could perform Aguilar's past work as a laminator.  She could not perform Aguilar's past work in a warehouse.  She could only perform Aguilar's past work as a cashier if she were permitted to sit and stand intermittently. R. 340.

The ALJ then asked the VE to assume that the claimant had the ability to perform sedentary work. R. 341. The VE opined that this person could not perform any of Aguilar's past work. However, she could perform other jobs available in significant numbers in the national economy, specifically small products assembly, dispatcher, and cashier. R. 341-42.

The ALJ then asked the VE to assume the following hypothetical claimant: same person, younger individual with a high school education and past work experience as described; can perform unskilled sedentary work with the freedom to alternate positions at will. The VE opined that this hypothetical claimant could not perform any of Aguilar's past relevant work. R. 343. However, this claimant could perform the jobs of cashier and surveillance system monitor. *Id.* She could also perform the small products assembly job assuming that she could sit for at least thirty minutes and sustain concentration. *Id.*

Counsel for Aguilar posed the following hypothetical to the VE. Same individual, education, and work history, but with chronic pain such that she would need to elevate her legs during the day. R. 344. The VE opined that this limitation would severely preclude work in the national economy. R. 345. The VE further opined that a proposed limitation due to sleepiness or pain from migraine headaches causing the claimant to close her eyes frequently would limit the ability to work as a surveillance system monitor. R. 347, 351. Finally, a limitation on manual dexterity and grasping would limit the claimant's ability do any of the proposed jobs other than surveillance system monitor. R. 347.

## IV.    STANDARD OF REVIEW.

To be entitled to Social Security disability benefits under SSI, a claimant must be unable to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 1382c(a)(3)(A).  A "physical or mental impairment" under the terms of the Act is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382c(a)(3)(C).  The Act provides further that a claimant is not disabled if he is capable of performing his previous work, or, if "considering his age, education, and work experience, [he could] engage in any other kind of substantial gainful employ which exists in the national economy." 42 U.S.C. §1382c(a)(3)(B).

This Court's review of a final decision by the SSA is limited to determining whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988), and whether the findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005).  "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Walden v. Schweiker*, 672 F.2d 835, 838-39 (11th Cir. 1982)(internal quotations omitted).

The court "'must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [SSA's] decision.'" *Walker v. Bowen*, 826 F.2d 996, 1000 (11th Cir. 1987)(quoting *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986)).  Even if the court finds that the evidence weighs against the SSA's decision, the court must affirm if the decision is supported by substantial evidence even if the proof preponderates against it. *Dyer*, 395 F.3d at 1210.  The court may not reweigh the evidence or substitute its own

judgment, even if the court finds that the weight of the evidence is against the SSA's decision. *Id.* While there is a presumption in favor of the SSA's findings of fact, no such presumption attaches to the ALJ's legal conclusion about the proper standards to be applied in evaluating claims. *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988).

## V.    ANALYSIS.

Aguilar asserts two grounds supporting reversal of the partial denial of her SSI application: (1) that the ALJ erred in concluding that Aguilar's impairments did not meet or equal the listing for a major dysfunction of a joint; and (2) that the ALJ failed to give proper weight to the opinion of Dr. Psarakis in determining Aguilar's RFC prior to October 1, 2001. These are the only issues I will address.[9]

    *A.    Listing of Impairments*.

Aguilar maintains that she meets the requirements for Listing 1.02, Major Dysfunction of a Joint Due to Any Cause. The Eleventh Circuit has held that a claimant may prove disability at step three of the sequential evaluation process

> by either (1) *meet*ing the listings or (2) *equal*ing the listings. In order to *meet* a listing, the claimant must (1) have a diagnosed condition that is included in the listings and (2) provide objective medical reports documenting that this condition meets the specific criteria of the applicable listing and the duration requirement.  A diagnosis alone is insufficient.  In order to *equal* a listing, the medical findings must be at least equal in severity and duration to the listed findings.

*Wilkinson ex rel. Wilkinson v. Bowen*, 847 F.2d 660, 662 (11th Cir. 1987) (internal citations omitted); *see also Shinn ex rel. Shinn v. Comm'r*, 391 F.3d 1276, 1285 (11th Cir. 2004)

---

[9]    The parties were advised that any issues not specifically raised in their memoranda of law would be waived.  Doc. No. 15 at 2.

(holding that "*Wilkinson* cannot be read as holding that *only* medical evidence can be taken into account").

Listing 1.02, major dysfunction of a joint due to any cause, provides, in relevant part, as follows:

> [G]ross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
>
> (A).  Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively . . . .

20 C.F.R. Part 404, Subp. P, App. 1.02.  Inability to ambulate effectively is defined as follows:

> [Being] capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. [The claimant] must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R. Part 404, Subpt. P., App. 1.00B2b.

Aguilar contends that she has introduced evidence of subluxation, chronic joint pain and stiffness, signs of limited range of motion, imaging of joint space narrowing, and an inability to ambulate effectively.  However, the ALJ concluded that clinical and laboratory

-18-

findings did not support this listing.  The ALJ's review of the medical records provided substantial evidence in support of that decision.

With respect to the requirement that Aguilar have a "gross anatomical deformity," Aguilar relied upon a medical report from 1989 that showed subluxation (dislocation) in her knee.  However, the ALJ noted that subsequent reports did not indicate subluxation. Indeed, an x-ray taken in March 1999, showed no acute fracture or dislocation of Aguilar's knees. R. 111.

Additionally, to meet or equal the listing, there must be substantial evidence of an inability to ambulate effectively, as defined in the regulations.  To satisfy this requirement, Aguilar relies on notes of an SSA interviewer who indicated that Aguilar limped after sitting for an interview.  Limping does not rise to the level of an inability to ambulate effectively as defined in the regulations.

Because substantial evidence exists that supports the ALJ's conclusion that Aguilar's condition did not meet or equal listing 1.02, Aguilar's first assignment of error is not well taken.

B.      The ALJ's Consideration of Dr. Psarakis's Opinion Regarding RFC.

Aguilar also contends that the ALJ failed properly to credit the physical capacity evaluation prepared by Dr. Psarakis in June 1999.   At that time, Dr. Psarakis opined that Aguilar was able to sit for one hour, stand for thirty minutes, and walk for five minutes in an eight-hour workday, and that there were no accommodations that would make it possible for Aguilar to work for a complete eight-hour workday.

Generally, if the opinion of a treating physician is well supported and not inconsistent with other evidence, it will be given controlling weight. 20 C.F.R. § 404.1527(d); 20 C.F.R. § 416.927(d).   When it is not given controlling weight, it will nevertheless be given some weight and will be considered. *Id*. The Eleventh Circuit has held that "the law of this circuit is clear that the testimony of a treating physician must be given substantial or considerable weight unless 'good cause' is shown to the contrary." *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997).  Good cause has been found where the treating physician's opinion was not bolstered by the evidence, was inconsistent with findings by other physicians or the treating physician's own records, or were merely conclusory. *Id*. (internal citations omitted). "The ALJ must clearly articulate the reasons for giving less weight to the opinion of a treating physician, and the failure to do so is reversible error." *Id*.

The ALJ articulated the following reasons for giving little weight to Dr. Psarakis's June 1999, RFC assessment:

> Dr. Psarakis opined that the earliest date the foregoing capacities and restrictions applied to the claimant was January 1974; yet, according to the medical record, Dr. Psarakis did not begin to treat the claimant until March 1998.  The overall examination at that time was noted to be very benign, except for mild crepitus throughout range of motion of both knees . . . . Furthermore, Dr. Psarakis had on July 27, 1999 placed no restrictions on the claimant, despite the claimant's complaint of bilateral knee and foot pain . . . .  Since Dr. Psarakis failed to provide relevant evidence to support his opinion and it is inconsistent with the record has given his opinion no significant weight.

R. 21.

The ALJ's assessment of Dr. Psarakis's notes of treatment of Aguilar in March 1998 is accurate. On March 6, 1998, Aguilar sought treatment from Dr. Psarakis regarding her migraine headaches and allergies. There is no indication in this treatment record that Aguilar had problems sitting, standing or walking due to knee pain or other impairments. R. 239. There is no indication in Dr. Psarakis's treatment records before or immediately after the June 1999, RFC assessment indicating that he imposed any restrictions on Aguilar's ability to sit, stand or walk.

The ALJ was also correct that Dr. Psarakis's opinion was inconsistent with other evidence in the record. Specifically, in March 1998, Aguilar was treated by Dr. Ramirez for knee pain, among other things. Yet, Dr. Ramirez's treatment notes reflect that Aguilar was able to exercise by riding a bicycle and walking. R. 235. Dr. Cooper, an orthopaedic surgeon, noted in March 1999, that Aguilar had marked arthritis in her knees. Nevertheless, he did not indicate that Aguilar had any restrictions on sitting, standing or walking. To the contrary, he proposed treating Aguilar with a knee brace. R. 112-13.

The ALJ articulated adequate reasons that are supported by substantial evidence in the record for giving no substantial weight to Dr. Psarakis's June 1999, RFC assessment. This was sufficient to establish good cause for his decision. Accordingly, Aguilar's second assignment of error is also unavailing.

## VI.    CONCLUSION.

For the foregoing reasons, it is **ORDERED** that the decision of the SSA is

**AFFIRMED**.  The Clerk of Court is directed to issue a judgment consistent with this Order

and, thereafter, to close the file.

_____**DONE** and **ORDERED** in Orlando, Florida on March 14, 2006.

*Karla R. Spaulding*
                                        KARLA R. SPAULDING
                                        UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties